UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN ROWLAND, | ) | CIV. 08-5076-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Stephen C. Rowland (Rowland), moves the court for reversal of the Commissioner of Social Security's (Commissioner) decision denying his application for disability insurance benefits for the period of April 29, 2002, through February 15, 2005. The Commissioner opposes the motion. The court reverses and remands.

## PROCEDURAL BACKGROUND

On June 19, 2002, Rowland applied for disability insurance benefits, alleging disability since March 14, 2002. AR 65-67. Rowland later amended his alleged disability onset date to April 29, 2002. AR 456. Rowland's application was denied initially and on reconsideration. AR 51-54, 57-59. Upon Rowland's request, Administrative Law Judge James W. Olson (ALJ Olson) held a hearing on May 15, 2003. AR 230. After the hearing, ALJ Olson requested Disability Determination Services (DDS) to schedule a consultative examination for Rowland. AR 63. Dr. Richard L. Beasley conducted the

examination on August 27, 2003. AR 221-22. Rowland sent a letter to ALJ Olson on November 4, 2003, requesting a supplemental hearing and stating that Dr. Beasley did not do a physical examination of Rowland but rather merely asked him questions. AR 132-33. On December 22, 2003, ALJ Olson issued a decision finding that Rowland was not disabled within the meaning of the Social Security Act. AR 227-236. On March 18, 2005, the Appeals Council granted Rowland's request for review, vacated the hearing decision, and remanded the case for further proceedings. AR 237-40. The Appeals Council found that Rowland was not properly afforded his right to due process with respect to the evidence relating to Dr. Beasley's consultative examination and noted that Dr. Beasley apparently did not perform any physical testing. AR 238-39. The Appeals Council also noted that testimony by Rowland's daughter raised a question of whether Rowland may have developed a mental impairment not documented in the record and that further development of Rowland's mental status was warranted.

On remand, Administrative Law Judge Larry M. Donovan (the ALJ) requested DDS to schedule psychological, audiological, and orthopedic and/or neurological consultative examinations for Rowland. AR 251. These examinations were conducted by Greg Swenson, Ph.D., audiologist Norman N. Sorensen, and neurologist Dr. Stephen Hata, respectively. AR 380-89, AR 392-93, AR 396-98. On January 18, 2006, the ALJ informed Rowland of his right

to submit written questions to Dr. Swenson, Mr. Sorensen, and Dr. Hata.  AR 252.  Counsel for Rowland proposed interrogatories on January 27, 2006.  AR 316-17.  These interrogatories were not presented to the consulting specialists.  The ALJ held a remand hearing on April 26, 2006.  AR 254.  After the hearing, the ALJ requested DDS to schedule a psychological consultative examination with Wechsler Adult Intelligence Scale, 3rd Edition (WAIS-III) testing for Rowland.  AR 276.  Dr. Leslie A. Fiferman performed the psychological evaluation on July 12, 2006.  AR 440-44.  On August 3, 2006, the ALJ provided Dr. Fiferman's report to Rowland and advised him of his right to make written comments and submit written questions for Dr. Fiferman.  AR 277-78.  Counsel for Rowland submitted written comments on August 8, 2006.  AR 333-34.  On August 21, 2006, the ALJ informed Rowland of his intention to submit written interrogatories, along with Dr. Fiferman's evaluation, to a medical expert.  AR 279.  Rowland requested that the ALJ send the interrogatories to Dr. Fiferman instead, AR 335, and the ALJ denied Rowland's request.  AR 290.  The medical expert opined that Rowland's mental impairments met or equaled a listed impairment beginning on February 15, 2005.  AR 447.  Counsel for Rowland submitted objections to the medical expert's opinions on September 24, 2006.  AR 336-37.

The ALJ apparently offered to issue a decision finding onset of disability on February 15, 2005, in exchange for Rowland's amendment of his alleged

date of onset to that date.  <u>See</u> AR 338-39.  Rowland declined this offer.  AR 338-39.  On November 21, 2006, the ALJ issued a decision finding that Rowland had not been disabled within the meaning of the Social Security Act from the alleged onset date through the date of the decision.  AR 23-36.

On June 18, 2008, the Appeals Council informed Rowland of its intention to issue a decision finding that Rowland was not disabled from the alleged onset date through February 14, 2005, and that Rowland became disabled on February 15, 2005.  AR 453.  Rowland submitted to the Appeals Council an alternative sequential evaluation under which his disability began on October 8, 2003.  AR 456-57.  On August 7, 2008, the Appeals Council issued a partially favorable decision, finding that Rowland was disabled beginning February 15, 2005, but not before that date.  AR 13-16.  This appeal followed.

**FACTUAL BACKGROUND**

Rowland was born October 8, 1948, making him 53 years old at the amended alleged onset date and 59 years old at the time of the Appeals Council's decision.  AR 491.  He lives near Pine Ridge, South Dakota, with his daughter, Sharon Rowland (Sharon), Sharon's three children, and the three children of another daughter who was killed in a car accident by a drunk

driver.[1]  AR 491-92.  Rowland's partner, Patricia Standing Soldier (Patricia), was previously married to Rowland for seventeen years and has lived with him for a total of thirty-four years.  AR 516.  Patricia maintains her own trailer home but has lived with Rowland for the last twelve years.  AR 516.  Rowland left school in seventh grade and obtained a GED in 1985.  AR 469, 493.  He worked as a patrol officer for the Bureau of Indian Affairs from October 1, 1986, until May 15, 1988, and as a police officer for the Oglala Sioux Tribe from May 15, 1988, until April 29, 2002.  AR 129, 304.

## I.    Medical Records

Rowland's medical records indicate a history of diabetes mellitus, hearing loss, vision problems, and mental impairments.  Rowland was diagnosed with type two diabetes mellitus on August 17, 1989.  AR 433.  He began receiving diabetic preventive foot care on December 21, 1995, and was diagnosed with diabetic retinopathy on November 21, 2000.  AR 181, 434.

On September 25, 2001, Rowland presented at the VA Black Hills Health Care System (Black Hills HCS) complaining of hearing loss in both ears.  AR 171.  Dr. Raymond Pierce referred Rowland to audiology for evaluation.  AR 172.  Dr. Pierce also noted that Rowland's diabetes mellitus was poorly controlled due to difficult life style and counseled Rowland about controlling

---

[1] Rowland's daughter and her husband were killed on October 19, 2002, four months after Rowland first applied for disability insurance benefits.  See AR 123.

his blood sugars. AR 172. Rowland saw Dr. Pierce on January 10, 2002, for a follow-up appointment. AR 174. Dr. Pierce did not perform an examination but ordered tests and adjusted Rowland's insulin dosage. AR 175.

On March 13, 2002, an Indian Health Services (IHS) audiologist found that Rowland had moderate to severe mixed hearing loss bilaterally and should wear hearing aids in both ears. AR 136, 145. Rowland had hearing aid follow-up appointments on April 15, 2002, and June 20, 2002. AR 143, 138.

On May 1, 2002, Rowland's family practice physician[2] assessed Rowland's ability to do work-related activities. AR 204-07. The physician opined that Rowland's ability to lift, carry, stand, walk, sit, push, and pull were not affected by his impairments. AR 204. Further, Rowland could frequently climb, kneel, crouch, crawl, and stoop, but could never balance because of his hearing impairment. AR 205. The physician also opined that Rowland's manipulative functions, including reaching all directions, handling, fingering, and feeling, were unlimited. AR 206. Further, the physician opined that Rowland's abilities to see and hear were limited because he had bilateral cataracts, diabetic retinopathy, and a hearing impairment that was only partially corrected by hearing aids. AR 206. Finally, Rowland's physician opined that Rowland's ability to handle exposure to humidity/wetness was unlimited, but that his diabetes mellitus and hearing impairment limited his

---

[2] The physician's signature is unreadable. See AR 3, 207.

6

ability to tolerate exposure to temperature extremes, noise, dust, vibration, hazards, fumes, odors, chemicals, and gases. AR 207.

Meanwhile, Rowland saw Dr. Pierce at Black Hills HCS again on March 15, 2002, to address his diabetes treatment. AR 178. Dr. Pierce noted that Rowland's meals were inconsistent because Rowland worked as a police officer and that Rowland was being weaned off insulin in an attempt to control his diabetes with only oral medications. AR 178. Dr. Pierce counseled Rowland on the importance of consistency in carbohydrate and meal intake. AR 178. Rowland returned to Black Hills HCS for a follow-up appointment for diabetes management on June 19, 2002. AR 180. Dr. Rodney D. Larson noted that Rowland was taking diabetes pills, was no longer taking insulin, and was slowly losing weight. AR 180. Rowland reported that his diabetes was getting better slowly. AR 180. Dr. Larson increased Rowland's dosage of diabetes medication and recommended that he continue to lose weight. AR 180.

Also on July 19, 2002, Rowland presented at the podiatry clinic at Black Hills HCS for an annual podiatric update. AR 181. Rowland's chief complaint at this visit was long toenails on both feet. AR 181. Examination of both feet found elongated toenails, no calluses in need of reduction, no erythema or cellulitis, no maceration, fissuring, or ulcerations, no masses, nodules, or areas of tenderness, and no edema. AR 181. Rowland reported no burning, tingling, or numbness in his feet. AR 181.

Rowland also underwent a complete audiometric evaluation on July 19, 2002.  AR 184.  Audiologist Paula J. Kennison found that Rowland had moderate to moderately-severe sensori-neural hearing loss with a mixed component in the right ear and moderate to moderately-severe mixed hearing loss in the left ear.  AR 185.  Further, speech audiometry results suggested that Rowland may have difficulty understanding normal conversational speech, even in ideal listening situations.  AR 185.  Tympanogram results suggested essentially normal middle ear function for both ears.  AR 185.

Dr. Kevin Whittle, a nonexamining DDS physician, reviewed Rowland's medical records on October 7, 2002, and found that Rowland had no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, and no environmental limitations.  AR 189-92.  With respect to communicative limitations, Dr. Whittle found that Rowland had limited hearing and unlimited speaking.  AR 192.  On December 4, 2002, Dr. Kristin A. Jensen, another nonexamining DDS physician, reviewed Rowland's medical records and noted that he had hearing loss, had scarred tympanic membranes, and used hearing aids.  AR 197.  Dr. Whittle also noted that Rowland had diabetes that was controlled by medication.  AR 197.  Dr. Whittle found that Rowland had no exertional limitations, no postural limitations, no manipulative limitations, and no visual limitations.  AR 197-200.  With respect to

communicative limitations, Dr. Whittle found that Rowland had limited hearing but unlimited speaking.  AR 200.

Rowland saw Dr. Larson at Black Hills HCS on December 17, 2002, for diabetes management.  AR 212.  Rowland reported a number of problems, including blurry vision for several months, a cold, a burning sensation in his toes with numbness, and dermatitis of his scalp.  AR 212.  Dr. Larson referred Rowland to an optometrist, prescribed Guaifenesin for a viral upper respiratory infection, and instructed Rowland to continue using Capzasin cream on his foot and to continue his current diabetes treatment plan.  AR 213.

Rowland had an eye exam at Black Hills HCS on February 12, 2003.  AR 210.  Optometrist Thomas A. Golis found that Rowland had type two diabetes mellitus with moderate to severe non-proliferative diabetic retinopathy that was more severe in his left eye than in his right eye.  AR 211.  Dr. Golis also found that Rowland was a glaucoma suspect due to a suspicious looking nerve in his left eye and prescribed corrective lenses.  AR 211.  Rowland returned to the Black Hills HCS eye clinic on June 18, 2003.  AR 214.  He reported that he had been having double vision since May 20, 2003, and that a CT scan at IHS on June 6, 2003, found no problems.  AR 214.  After examining Rowland's eyes, Dr. Golis again found that Rowland had moderate to severe non-proliferative diabetic retinopathy as well as clinically significant macular edema in his left eye.  AR 215.  Dr. Golis indicated that Rowland appeared to have a left sixth

cranial nerve palsy caused by small blood vessel disease, which would improve in a few months. AR 215. Dr. Golis instructed Rowland to return to the clinic for evaluation of laser treatment on his left eye and to follow-up on his double vision. AR 215.

Rowland saw Dr. Larson for a routine diabetes management appointment on June 18, 2003. AR 216. Rowland reported that he went to the IHS hospital for diabetes care and assessment of double vision. AR 216. Rowland reported that a CT scan was negative for any tumors or other causes of double vision. AR 216. Rowland also reported that he began taking a different diabetes medication than the one prescribed by Black Hills HCS physicians. AR 216. Dr. Larson found that Rowland's type two diabetes mellitus was in fair control but needed improvement. AR 216. He advised Rowland to walk two miles a day, reduce his intake of carbohydrates, and increase his consumption of fruits, vegetables, lean meats, and poultry. AR 216. Dr. Larson also found that Rowland's diabetic peripheral neuropathy was in good control with Capzasin cream. AR 216. Dr. Larson opined that Rowland's double vision was probably benign. AR 217.

Rowland underwent focal laser treatment on his left eye on July 10, 2003, at Black Hills HCS. AR 345. He was instructed to return in two weeks to have the same procedure performed on his right eye, but he did not have his right eye treated until October 21, 2004. AR 343, 345.

DDS physician Dr. Beasley saw Rowland on August 27, 2003. AR 221.

Dr. Beasley noted that Rowland was referred to him for evaluation of diabetes

and bilateral hearing loss. AR 221. Rowland denied fatigue or chills, any

change in vision or hearing, any cartoid bruits or thyroid nodules, any

significant shortness of breath or cough, any chest pains or palpitations, any

change in bowel habits, any urinary incontinence or frequency, any skin

rashes, any bleeding abnormalities, and depression. AR 222. Rowland

indicated that he had diabetes and a little bit of tingling in his feet and hands.

AR 222. Dr. Beasley's record indicates that he took Rowland's vital signs and

examined Rowland's head, ears, nose, throat, neck, lungs, abdomen, and

extremities. AR 222. Dr. Beasley observed that Rowland had slight loss of

proprioception in the lower feet area. AR 222. Overall, Dr. Beasley found that

Rowland's diabetic care was well-controlled. AR 222. He explained, "[h]e does

not seem to have significant secondary causes. Patient does have some

retinopathy although well controlled with Laser therapy and not affecting his

visual acuity. Patient also has a little bit of peripheral neuropathy although

mild and again I do not feel that it should interfere with his ability to be

employed." AR 222. With respect to Rowland's hearing loss, Dr. Beasley found

that Rowland was able to participate in conversations and understood what

Dr. Beasley was saying at a distance over ten feet. AR 222. Therefore,

Dr. Beasley concluded that Rowland's hearing loss should not be very limiting

for his ability to be employed in a traditional setting.  AR 222.  Dr. Beasley also
assessed Rowland's ability to do work-related activities and found that
Rowland had no exertional limitations, no postural limitations, no manipulative
limitations, no visual/communicative limitations, and no environmental
limitations.  AR 223-26.

Rowland returned to the podiatry clinic at Black Hills HCS on
December 15, 2003.  AR 359.  Rowland reported that he had no specific foot
problems.  AR 359.  Dr. Barry L. Jacobs found that Rowland had early signs of
peripheral neuropathy, discussed this condition with Rowland, and renewed
Rowland's Capzasin cream prescription.  AR 361.

Rowland presented to the ophthalmology clinic at Black Hills HCS on
July 10, 2004.  AR 344.  An appointment for laser treatment on his right eye
was scheduled.  AR 344.

Rowland had a diabetes follow-up appointment at Black Hills HCS on
July 12, 2004.  AR 361.  Rowland complained of left ear pain and difficulty
getting his hearing aid in that ear.  AR 362.  Dr. Carl W. Graves found that
Rowland had bilateral serous otitis media with some external otitis on the left
ear.  AR 362.  Rowland also complained of some numbness and pain in his
lower extremities.  AR 362.  Dr. Graves found that Rowland had good sensation
in his feet.  AR 362.  Dr. Graves prescribed gabapentin to relieve the numbness
and pain.  AR 362.

Rowland saw Dr. Golis at the Black Hills HCS eye clinic on August 19, 2004. AR 362. He reported that his double vision went away as long as he controlled his blood sugar. AR 363. Upon examination, Dr. Golis confirmed his earlier diagnoses of moderate to severe non-proliferative diabetic retinopathy that was more severe in his left eye and clinically significant macular edema in his left eye. AR 364. Dr. Golis noted that the left sixth cranial nerve palsy had resolved and that Rowland was a glaucoma suspect. AR 364. Dr. Golis instructed Rowland to return to the clinic for evaluation for laser treatment. AR 364. Rowland underwent focal laser treatment on his right eye on October 21, 2004. AR 343. There were no complications from the procedure. AR 343.

On November 4, 2004, Rowland had a diabetes evaluation at the Fort Meade VA clinic. Daniel Kenney, PA-C, found that Rowland had early diabetic neuropathy of both distal lower extremities, moderate bilateral diabetic retinopathy, and impotency and erectile dysfunction secondary to diabetes. AR 436.

On December 2, 2004, Rowland returned to Dr. Graves for a diabetes follow-up appointment. AR 366. Rowland reported that the numbness and pain in his lower extremities felt better after he began taking gabapentin. AR 366. Dr. Graves noted that Rowland had applied for Agent Orange Compensation because he handled a lot of Agent Orange while in the Army.

AR 367.  Dr. Graves also noted that the nurse's triage note indicated that Rowland was positive for post-traumatic stress disorder (PTSD) screening, but that Dr. Graves did not find Rowland to demonstrate classic PTSD symptoms based on his military experiences.  AR 367.  Dr. Graves referred Rowland for a mental health screening.  AR 367.

Also on December 2, 2004, Rowland had a follow-up appointment at the Black Hills HCS laser clinic.  AR 342.  The record indicates that his left eye looked good and his right eye looked better but may need more laser treatment in the future.  AR 342.

On December 13, 2004, Rowland had his annual podiatry appointment with Dr. Jacobs at Black Hills HCS.  Rowland reported that he had some burning and numbness in his feet and numbness in both big toes.  AR 369. Dr. Jacobs reviewed diabetic education and peripheral neuropathy with Rowland and maintained Rowland's current treatment plan.  AR 371.

Rowland presented for an ophthalmology follow-up at Black Hills HCS on January 20, 2005.  He complained that both eyes seemed more blurry and watered a lot when he was reading.  AR 371.  Ophthalmologist Gail A. Bernard found that Rowland had clinically significant macular edema due to non-proliferative diabetic retinopathy that continued to improve slowly.  AR 372. Dr. Bernard also found that Rowland had cortical cataracts progressing in both eyes.  AR 372.

Rowland saw nurse practitioner Kathleen E. Baumiller for a psychiatric consultation at the Black Hills HCS on February 15, 2005. AR 373. Rowland stated, "I think I had depression and anxiety a long time ago, I figured that was just a part of me." AR 373. Rowland indicated that he saw a mental health provider once when he was in Vietnam and underwent alcohol treatment in 1985. AR 373. Rowland also stated that he had two or three attacks of nerves per year and sometimes had to breathe into a paper bag. AR 373. Rowland also indicated that he sometimes woke himself up feeling afraid and helpless but did not remember the content of his dreams. AR 373. Rowland stated that he did not have flashbacks, but indicated that he isolated himself, he found it hard to get dressed some days, and his concentration and energy were poor. AR 373. Baumiller found that while Rowland described some PTSD symptoms, namely anxiety, nightmares, and irritability, he did not fully meet the criteria for this disorder. AR 375. Baumiller further found that Rowland did meet the criteria for dysthymia based on his description of depressed mood, poor concentration, lack of energy, lack of pleasure in doing usual hobbies, wanting to isolate, and involvement in a stressful dispute over custody of his grandchildren whose parents died in 2002. AR 375. Baumiller prescribed sertraline, an antidepressant, to help relieve some of these symptoms. AR 375. Baumiller assigned Rowland a Global Assessment of Functioning (GAF) of 65.

AR 375.  She did not indicate the date on which she believed Rowland's symptoms of dysthymia developed.

Rowland saw Baumiller for supportive therapy and medication management on a monthly basis after his initial psychiatric consultation.  On March 15, 2005, Rowland indicated that he thought the antidepressant was helping a little bit, that he felt more like getting out and doing things, and that he had not been isolating as much.  AR 376.  Rowland indicated that he sometimes did not start a task because he was afraid it would not turn out, and that he still had some trouble with worrying.  AR 376.  Baumiller noted that Rowland had gained some benefit from the sertraline, but that he was not as good as he could be.  AR 376.  Baumiller increased Rowland's dosage of sertraline.  AR 376.  Rowland saw Baumiller again on April 20, 2005, and indicated that the medication was helping a little bit.  AR 376.  Rowland reported that he was playing volleyball in the evenings with his family but still had trouble with procrastination.  AR 376.  Baumiller increased Rowland's dosage of sertraline.  AR 377.  Rowland saw Baumiller on June 7, 2005, and indicated that he lost his medication while on a trip and that his depression was better with medication.  AR 377.  Rowland also reported playing volleyball and horseshoes with his family in the evenings and planning a trip to San Diego for enjoyment.  AR 377.  Baumiller ordered a refill of sertraline at the same dosage set on April 20, 2005.  AR 377.

Rowland saw Dr. John F. Knecht for a diabetes follow-up on June 8, 2005. AR 378. Rowland indicated that he lost his glyburide, which caused his sugar levels to be high. AR 378. Dr. Knecht instructed Rowland to come back in four months for a comprehensive metabolic panel, lipid panel, urinalysis, and other tests. AR 378.

Rowland saw Baumiller on July 19, 2005, for supportive therapy and medication management. AR 379. Rowland stated that he went on a family vacation to Nevada and did really well on the trip, but was a little depressed after returning. AR 379. Baumiller encouraged Rowland to remain as active as possible, ordered a refill of his sertraline, and scheduled a follow-up appointment in three months. AR 379.

Rowland had a full eye exam at Black Hills HCS on October 12, 2005. AR 417. Optometrist John B. Jarding diagnosed him with moderate to severe non-proliferative diabetic retinopathy that was more severe in his left eye and identified Rowland as a glaucoma suspect. AR 419. Dr. Jarding also ordered new glasses for Rowland. AR 419.

Rowland also saw Dr. Knecht for a diabetes follow-up on October 12, 2005. AR 416. Rowland reported that he had restless legs and increasing nocturia. AR 416. Dr. Knecht decreased Rowland's dosage of oral hyperglycemics and re-started him on insulin. AR 416. Rowland saw

Dr. Knecht again on November 23, 2005.  AR 415.  Dr. Knecht increased

Rowland's dosage of insulin.  AR 415.

Meanwhile, Rowland saw Baumiller on October 18, 2005, for supportive

therapy and medication management.  AR 415.  Rowland reported that his

moods were up and down in relation to the stress of the custody dispute

regarding his grandchildren, but that otherwise his mood had been good.  AR

416.  Rowland also indicated that he was planning a memorial run in memory

of his daughter.  AR 416.  Baumiller maintained Rowland's dose of sertraline

and ordered a follow-up appointment in two months.  AR 416.

Dr. Swenson, a DDS examiner, conducted a psychological evaluation of

Rowland on December 6, 2005.  AR 380.  Patricia accompanied Rowland to his

evaluation and provided important information that he failed to recall

throughout the evaluation.  AR 380, 383.  Dr. Swenson noted that Rowland

had a hearing impairment and lost one of his hearing aids.  AR 380.

Dr. Swenson also noted the Rowland had difficulty hearing during the

consultation, but was able to hear when Dr. Swenson raised his voice

consistently and repeated questions.  AR 383.  Patricia reported that Rowland's

levels of energy and motivation had progressively decreased over several years.

AR 384.  She also indicated that Rowland was not overly excited and seldom

laughed, showed any strong emotion, or showed anger.  AR 384.

Dr. Swenson found that Rowland's short-term memory appeared to be intact because he was able to recall most of the material he had learned about thirty minutes earlier. AR 383. But Dr. Swenson found that Rowland's remote memory was somewhat impaired. AR 383. Patricia had to remind Rowland of things in order to jog his memory. AR 383. Dr. Swenson found that Rowland was able to understand and follow instructions and appeared to work at a slow pace. AR 384. His comprehension, judgment, knowledge, vocabulary understanding, and ability to perform mathematical calculations were low-average. AR 384. Dr. Swenson estimated Rowland's general intelligence to be in the average range. AR 384. Dr. Swenson found that Rowland's thought processes were essentially normal and his affect was generally appropriate.

Dr. Swenson administered the Minnesota Multiphastic Personality Inventory-II (MMPI-II) test. AR 384. Rowland produced an extremely elevated validity scale, which Dr. Swenson attributed to unusual sensitivity to emotional, physical, and mental abnormalities. AR 384. Dr. Swenson indicated that Rowland endorsed an extremely high number of physical symptoms, feelings of inability to control thoughts and emotions, obsessive thinking, a depressive syndrome, and a sense of disconnection from others. AR 384. Overall, Dr. Swenson diagnosed Rowland with major depressive disorder of mild severity and adjustment disorder with depressed mood and assigned a GAF of 55. AR 386.

Dr. Swenson also assessed Rowland's ability to do work-related activities on December 8, 2005. AR 388. He found that Rowland had slight impairments in understanding, remembering, and carrying out short and simple instructions and in his ability to make judgments on simple work-related decisions. AR 388. Dr. Swenson found that Rowland had marked impairments in understanding, remembering, and carrying out detailed instructions. AR 388. Dr. Swenson explained that Rowland's "[m]ental status exam revealed difficulty retaining detailed information and carrying out more complex instructions." AR 388. Dr. Swenson further found that Rowland had moderate impairments in interacting appropriately with the public, supervisors, and co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. AR 389. He explained that Rowland "requires that others speak loudly because of his hearing impairment. If not, he may not indicate he hasn't heard or understood, smiling blankly." AR 389. Dr. Swenson also noted that Rowland was quite detached from others, may demonstrate unusual behaviors, and may have unrealistic thinking. AR 389. Finally, Dr. Swenson indicated that Rowland's level of motivation and energy were impaired as a result of diabetes and depression. AR 389.

On December 13, 2005, Rowland had his annual podiatric exam at Black Hills HCS. AR 411. He was counseled on preventive foot care and given a pair of orthopedic inserts. AR 414.

Audiologist Sorensen, a DDS examiner, saw Rowland on December 19, 2005, for a hearing evaluation. AR 392. Rowland reported that he experienced constant tinnitus in both hears that did not bother him at all, used hearing aids in both ears, and had lost his right hearing aid. AR 392. Sorensen indicated that Rowland was able to follow the questions during the case history, but that he had to lean in and tilt his left ear forward to be able to hear. AR 392. A pure tone audiometry revealed moderately severe, sensorineural hearing loss in both ears with an asymmetry evident between the ears. AR 392. Rowland's speech reception thresholds were excellent at 96 percent. AR 392. Immittance testing showed a normal Type A tympanogram for the left ear and a flat Type B tympanogram for the right ear. AR 392. Overall, Sorensen found that Rowland had a significant hearing loss in both ears that had gotten worse compared to previous results. AR 392. Sorensen opined that Rowland's hearing aids were several years old so that he would benefit from new hearing aids in both ears. AR 392.

Rowland saw Baumiller for supportive therapy and medication management on December 20, 2005. AR 411. Rowland reported that his mood had been down and that he noticed a decrease of motivation in the morning.

AR 411.  Baumiller instructed Rowland to take his medication at bedtime rather than in the morning.  AR 411.

Dr. Hata performed a neurologic evaluation on December 22, 2005.  AR 396.  Dr. Hata found that Rowland had no impairments of upper extremity function and no motor impairment of the lower extremities.  AR 398.  Dr. Hata found that Rowland had a severe hearing impairment that made communication with him difficult.  AR 398.  Dr. Hata indicated that Rowland had no significant loss of vision that would impair his normal activities.  AR 398.  Dr. Hata concluded that Rowland was not impaired in activities of daily living or normal functioning, but that he could not work at heights or in situations where a high degree of balance and coordination were required in regard to lower extremity function.  AR 398.  Dr. Hata also assessed Rowland's ability to do work-related activities and found that Rowland had no impairment of his ability to lift and carry and that his ability to use his hands or feet was not affected by any impairments.  AR 399, 400.  Dr. Hata found that Rowland could sit, stand, or walk for one hour at a time, and would have to change his position for at least ten minutes before returning to standing and/or sitting.  AR 400.  Dr. Hata found that Rowland could occasionally climb stairs, climb ladders or scaffolds, stoop, crouch, kneel, crawl, and balance.  AR 401.  With respect to Rowland's hearing impairment, Dr. Hata found that Rowland retained the ability to hear and understand simple oral instructions and to

communicate simple information, but he could not use a telephone to communicate. AR 401. Finally, Dr. Hata concluded that Rowland's limitations were first present on March 1, 2002. AR 402.

Rowland saw Baumiller on January 17, 2006, and reported that he was having trouble with his memory. AR 410. Specifically, Rowland stated that he was having trouble remembering appointments, keeping track of his medications, and remembering to pay bills. AR 410. Rowland reported that he drove his own car and did not have any difficulty with getting lost. AR 410. Baumiller administered a Folstein mini mental state exam. AR 410. Rowland had some difficulty with immediate recall and did not remember to pick up the paper with the correct hand, but otherwise was able to complete the test satisfactorily. Baumiller changed Rowland's antidepressant from sertraline to citalopram. AR 410.

Finally, Dr. Fiferman performed a psychological evaluation on July 12, 2006. AR 440. Dr. Fiferman evaluated Rowland based on a clinical diagnostic interview including a mental status evaluation, consultation with Patricia, administration of the WAIS-III, and review of prior reports and records. AR 440. Dr. Fiferman noted that Rowland made an honest and genuine effort to comply with the demands of the evaluation, but that he allowed Patricia to complete his answers when he had memory problems. AR 441. Rowland indicated that he had been in a deep depression for five years, but Patricia

indicated that she believed Rowland had been depressed most of his life. AR 443. Patricia also reported that Rowland began having problems keeping records of arrest statistics, mileage, and gas receipts, so Patricia and Rowland's sister did the paperwork for him. AR 443. Dr. Fiferman found that Rowland exhibited "pervasive and increasingly pathological symptoms" and had a chronic history of psychological and medical problems that compromised his ability to function. AR 440. Dr. Fiferman diagnosed Rowland with dementia, major depression (recurrent and moderate), PTSD (chronic), alcohol dependence (full, sustained remission), and borderline intellectual functioning. AR 441. Dr. Fiferman assigned a GAF of 44 and found that Rowland's highest GAF in the previous year was 48. AR 441.

## II. Non-Medical Evidence

### A. Daily Activities Questionnaires

Rowland completed a daily activities questionnaire on August 6, 2002. AR 85-88. Rowland indicated that he had not experienced any changes in his sleeping habits, was able to take care of his personal needs, and maintained his own checking account. AR 85. His daughters prepared all of his meals, did all of the shopping, and did all of the household chores. AR 85-86. Rowland stated that he watched family movies on the television and read the daily newspaper. AR 86. He was able to remembered what he watched and read. AR 86. Rowland indicated that he went out daily, drove a car to local

functions, meetings, and the hospital, and played cards with friends once a week.  AR 87.  Rowland stated that he did not have problems remembering, concentrating, finishing a task or chore, or following written or verbal instructions.  AR 87.  Finally, Rowland indicated that his hearing loss prevented him from working.  AR 87.  He used a hearing aid in his left ear and needed one in his right ear, but he could not afford to purchase one.  AR 87.

Rowland's sister, Elizabeth Rowland (Elizabeth), also prepared a daily activities questionnaire relating to Rowland on August 13, 2002.  AR 117-20. She indicated that Rowland interacted with others and had weekly visits with his family.  AR 119.  His only problem in getting along with others was that he needed a hearing aid for his left ear.  AR 119.  Elizabeth indicated that Rowland did not have problems concentrating, remembering, following instructions, being confused, or displaying unusual behavior.  AR 120.  She stated, "[m]y brother has severe hearing loss in both ears and is in need of a hearing aid for his left ear.  Has no [psychological] problems."  AR 120 (modified to correct spelling).

### B.    Rowland's Request for Reconsideration

Rowland filed a request for reconsideration with the Social Security Administration on November 11, 2002.  AR 111-14.  He indicated that he lost his job because of hearing loss, could not afford to buy the necessary hearing aids, could not hear everyday conversations, experienced a buzzing in his head

and associated headaches from the hearing aids he had, and experienced dizziness. AR 111. Rowland stated that he was still able to care for his personal needs except for when he had headaches and dizziness. AR 113. With respect to his daily activities, he stated, "I stay at home and rarely have contact with anyone except my own family. I am getting depressed." AR 113.

### C.    Affidavit of Rowland's Daughter

Rowland's daughter, Sharon, submitted an affidavit dated July 12, 2004. AR 308-09. She indicated that she had lived with Rowland for the last ten years. AR 308. Sharon indicated that her father had difficultly keeping his blood sugars level when he was working as a police officer. AR 308. As a result, she indicated that he came home "beat" and took a nap as soon as he got home. AR 308. Sharon also indicated that her father lost his job because of his hearing. AR 308. She was relieved when he was let go because she did not think working was safe for him because he relied on lip-reading to understand what other people were saying and could not hear them if his back was turned. AR 308. Sharon also indicated that Rowland had vision blurriness and double vision because of his diabetes and could no longer drive. AR 309. Sharon stated that Rowland had lost interest in activities like playing with his family, being outdoors, and doing light mechanical work on his vehicles. AR 309. Rowland also became more isolated and tired, but was unable to sleep without waking frequently. AR 309. Overall, Sharon felt that

her father's health had gone gradually downhill, that he was experiencing grief about his daughter's death, that he was depressed and fatigued, and that it would be dangerous for him to keep working.  AR 309.

### D.    Service-Connected Disability Compensation

Rowland applied for service-connected compensation from the VA on August 23, 2004.  AR 312.  On December 16, 2004, the VA assigned a 20 percent disability rating to Rowland's type two diabetes mellitus effective August 23, 2003.  AR 320.  The VA found that Rowland's type two diabetes mellitus was service-connected based on a presumption that he was exposed to herbicides while serving in Vietnam.  AR 321.  The VA assigned a 20 percent disability rating because Rowland was taking medications for his diabetes and was on a restrictive diet, but he did not have activity restrictions and did not require insulin.  AR 322.  The VA established the effective date of Rowland's eligibility for service-connected compensation based on the date he applied for compensation.  AR 322.

The VA assigned a zero percent disability rating to Rowland's peripheral neuropathy of the right lower extremity, peripheral neuropathy of the left lower extremity, diabetic retinopathy, and erectile dysfunction.  AR 320-21.  With respect to peripheral neuropathy of the lower extremities, the VA assigned a noncompensable evaluation because Rowland did not have incomplete paralysis of foot movements that was mild, a symptom that was required for a

higher evaluation.  AR 323.  With respect to diabetic retinopathy, the VA assigned a zero percent evaluation because Rowland had full visual fields of 25/25 and no double vision.  AR 324.  Finally, with respect to erectile dysfunction, the VA assigned a zero percent evaluation because Rowland had no penile deformity, which was required for a higher evaluation.  AR 324.  But the VA found that Rowland was entitled to a special monthly compensation based on Loss of Use of a creative organ based on erectile dysfunction effective November 4, 2004.  AR 321.

    **E.    Hearing Testimony**

    At the first ALJ hearing, held on May 15, 2003, Rowland's sister, Elizabeth, testified that Rowland sometimes had difficulty reading and understanding things and that she usually read and explained those things to him.  AR 469.  Rowland testified that when he was working as a police officer and needed to prepare a police report, he had to have Elizabeth write out the report because he had problems with that.  AR 470.  Rowland also indicated that he went to a special reading class in the Army.  AR 470.

    Rowland testified that his worst physical problems were hearing and diabetes.  AR 471.  The diabetes caused his feet to hurt when it was hot and feel cold at bedtime.  AR 475.  He also got sores on his hand that he treated with salve.  AR 476.  Rowland testified that he did not have any difficulties with personal grooming and was able to do housework.  AR 478.  He could sit for an

hour at a time, stand for an hour and a half, walk 100 yards at a time, and lift ten pounds.  AR 479-80.

The remand hearing was held on April 26, 2006.  AR 487.  Rowland testified that he had two hearing aids and was wearing both at the hearing.  AR 494.  Still, he testified, it was kind of hard to hear with both hearing aids in and turned up high.  AR 495.  Rowland testified that he had had his right hearing aid since March 2002.  AR 495.  He had lost his left hearing aid and applied for a new one in October 2005.  AR 495.

Rowland testified that he managed his diabetes by taking insulin twice a day, checking his blood sugars twice a day, and taking mediation for his legs.  AR 496-97.  Rowland also testified that his feet felt like they were freezing in the wintertime or when he went to sleep and that his feet were numb on the bottom.  AR 497.  The medication helped a little, but he could still feel pain when his legs were cramping.  AR 497.  Rowland also testified that he had eye problems and knee pain.  AR 508-09.

Rowland testified that he normally got up at 10 a.m. to noon and spent most of his day watching television and walking around.  AR 501.  He did not cook for himself.  AR 501.  He testified that two of his grandchildren attended school during the daytime, and that he took care of his three-year-old grandchild.  AR 502.  Rowland testified that he watched television in one room while his grandchild watched television in another room.  AR 502.  He made

cereal for his grandchild, but did not cook. AR 502. Rowland testified that he did not give his grandchildren a bath, pick out their clothes, or help them get dressed. AR 503. His partner, Patricia, had her own trailer, but had been staying at Rowland's house and helping him with their grandchildren. AR 503. Rowland did not shop for food, do dishes, or wash his own clothes because he did not have the energy to do so. AR 504. Rowland testified that he did not do yardwork and only went to Native American celebrations in the summertime. AR 505. He had a driver's license but quit driving because of his health around 2003. AR 500.

Rowland testified that he could sit for about ten minutes at a time and stand for about ten minutes at a time. AR 506. He could walk about ten minutes before needing to take a break. AR 506. Rowland testified that he had a hard time breathing if he tried to lift anything heavy, but that he could carry one pound across the room. AR 506. Rowland testified that he played poker with his sister and ex-wife about two weeks before the hearing. AR 514. They played for a couple of hours, and Rowland had to get up and walk around. AR 514. Rowland also testified that his concentration was not good. AR 513.

Rowland testified that he had helped organize a memorial walk/run for his daughter for two years. AR 492, 512. Rowland helped with things like the posters. AR 493. He tried to walk the course, but only made it about one-

quarter of a mile before having to get a ride. AR 512. He felt out of breath and his feet hurt after walking that far. AR 512.

Rowland testified that toward the end of his work as a police officer, he had trouble writing his police reports so he asked his sister to help him write them. AR 510. She asked Rowland what happened and wrote down the report. AR 510. Rowland's abilities to spell, add, and subtract got worse. AR 510-11. When he had to add up his reports to submit a monthly report, his sister did the adding for him. AR 511.

Rowland's ex-wife and current partner, Patricia, also testified at the remand hearing. AR 516. Patricia testified that she had been living with Rowland for about twelve years, but she still owned her own trailer home. AR 516. Patricia testified that when Rowland was working as a police officer, she had to help him calculate his mileage, his gasoline, and his arrest statistics. AR 518. She also helped him determine military time. AR 518. At one time, Rowland was able to do these things for himself. AR 518. Patricia also testified that Rowland stopped driving about three or four years before the hearing because he would pull out in traffic without looking for cars on each side and could not hear the horn if anybody honked at him. AR 517. Also, Rowland could not see well enough to drive. AR 517.

Rowland's sister, Elizabeth, also testified at the remand hearing. She testified that she helped Rowland prepare his police reports in the last two

years that he worked.  AR 521.  Rowland could not remember the sequence of events, so Elizabeth asked him questions about what happened and wrote the report for him.  AR 521-22.

Nancy Winfrey, Ph.D., testified at the remand hearing as a mental health expert.  AR 523.  She testified that the information on Rowland's mental health was relatively recent.  AR 524.  Based on this information, she found that Rowland had depression with anhedonia, sleep disturbance, decreased energy, and difficulty concentrating.  AR 525.  She found that Rowland had moderate difficulties maintaining activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  AR 525-26.

Finally, Jerry Gravatt testified as a vocational expert.  AR 530.  Gravatt testified that a person of Rowland's age, education, and past work experience who should be allowed to alternate between standing and walking or sitting on an hourly basis, who should only occasionally walk up or down steps, climb ladders, stoop, kneel, crouch, or crawl, who should be allowed to wear glasses and hearing aids in both ears, who could not be subjected to concentrated exposure to extreme cold, extreme heat, noise, or vibration, who should be allowed to possess and use blood sugar testing equipment, and who should be allowed to possess and use any medication, snacks, or beverages necessary to react to blood sugar test results could work as a patrol officer.  AR 532.  This

person could also do semiskilled, light work such as working as a security guard or sedentary semiskilled work such as police dispatch radio operation. AR 533. Gravatt further testified that if the same person needed to lie down more than an hour and a half every day, he would be unable to do any of Rowland's past relevant work or any other work at any skill or exertional level. AR 533.

### F.    Mental Health Expert Interrogatories

After the hearing and after Dr. Fiferman completed his psychological evaluation of Rowland, the ALJ submitted interrogatories to Dr. Winfrey.   AR 445.  On September 19, 2006, Dr. Winfrey modified the opinion she announced at the remand hearing and opined that the medical evidence in the record indicated that Rowland had the following mental impairments: dysthymia, dementia (not otherwise specified), major depression, PTSD, and borderline intellectual functioning.  AR 446.  Dr. Winfrey also indicated that the medical records were discrepant concerning Rowland's activities of daily living, and that Rowland might have shown increased impairment with time.  AR 446. Dr. Winfrey opined that Rowland's mental impairments met or equaled a listed impairment on February 15, 2005, based on Baumiller's treatment notes.  AR 447.  Dr. Winfrey explained that Rowland's "activities of daily living seem in the marked range of functional impairment" and that "even though [Rowland] performed in the borderline range of cognitive dysfunction, the description of

need of reminders for even basic tasks including hygiene seem to point to marked dysfunction in terms of concentration, persistence and pace." AR 451.

## ALJ AND APPEALS COUNCIL DECISIONS

On November 21, 2006, the ALJ issued a decision finding that Rowland had not been disabled within the meaning of the Social Security Act from the alleged onset date through the date of the decision. AR 23-36. The ALJ outlined the five-step sequential evaluation process for determining whether an individual is disabled. AR 24-29.[3] At step one, the ALJ found that Rowland had not engaged in substantial gainful activity since April 29, 2002. AR 29. At step two, the ALJ found that Rowland suffered from diabetes, a condition that was severe under the Social Security regulations. AR 29. The ALJ also considered Rowland's alleged bilateral hearing loss, arthritis, and mental impairments, including dementia not otherwise specified, major depression, PTSD, borderline intellectual functioning, and dysthymia, and found that these

---

[3] "To determine disability, the Commissioner uses the familiar five-step sequential evaluation, [and] determines: (1) whether the claimant is presently engaged in a 'substantial gainful activity'; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform." Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (internal footnote omitted).

conditions were not severe under the Social Security regulations.  AR 29-31.

At step three, the ALJ found that Rowland's diabetes mellitus did not meet or

medically equal a listed impairment.  AR 31.

At step four, the ALJ formulated Rowland's residual functional capacity

(RFC) as follows:

> the claimant retains a residual functional capacity to perform
> substantially all (as defined in Social Security Ruling 83-11) of the
> seven primary strength demands required by work at the given
> level of exertion (as defined in Social Security Ruling 83-10), who
> requires an ability to alternate between sitting, standing and
> walking on an hourly basis if needed, who can occasionally climb
> stairs, steps and ladders, stoop, kneel, crouch and crawl, who
> needs to wear glasses and wear hearing aids in both ears, who
> should not be subjected to concentrated exposure to extreme cold,
> heat, noise or vibration, and who needs to be allowed to use blood
> sugar testing equipment as well as possess and use any medicine,
> snacks or beverages in response to those blood test results.

AR 32.  In formulating Rowland's RFC, the ALJ found that Rowland's

statements concerning his impairments and their impact on his ability to work

were "barely credible in light of the medical evidence and the discrepancies

between the claimant's assertions and the information contained in the

documentary reports."  AR 34.  Based on Rowland's RFC, the ALJ found that

Rowland was capable of performing his past relevant work as a patrol officer.

AR 35.  In light of the ALJ's finding at step four, the ALJ found that Rowland

was not under a disability within the meaning of the Social Security Act from

the alleged onset date through the date of his decision and did not reach step

five.

On August 7, 2008, the Appeals Council issued a decision adopting the findings of the ALJ with respect to the period between the alleged onset date and February 15, 2005, and reversing the decision of the ALJ with respect to the period beginning February 15, 2005. AR 15. The Appeals Council followed the five-step sequential evaluation. At step one, the Appeals Council agreed with the ALJ that Rowland had not engaged in substantial gainful activity since his alleged onset date. AR 13. After step one, the Appeals Council divided its analysis into the period before February 15, 2005, and the period after February 15, 2005. With respect to the period before February 15, 2005, the Appeals Council concurred with and adopted the ALJ's findings that Rowland's only severe impairment was diabetes mellitus, that this impairment did not meet or equal a listed impairment, that Rowland could perform work at all exertional levels but was limited by the need for environmental and postural limitations, and that Rowland was capable of performing his past relevant work as a patrol officer. AR 14. The Appeals Council also concurred with and adopted the ALJ's evaluation of Rowland's subjective complaints and credibility for the period before February 15, 2005. AR 14. With respect to the period after February 15, 2005, at step two of the sequential analysis, the Appeals Council found that Rowland had the following severe impairments: diabetes mellitus, dysthymia, dementia not otherwise specified, major depression, and PTSD. AR 13-14. At step three, the Appeals Council found that Rowland's

36

mental impairments met the criteria of section 12.04 of the Listing of

Impairments.[4]  AR 14.  As a result, the ALJ found that Rowland was disabled

within the meaning of the Social Security Act beginning February 15, 2005, but

not before that date, and did not go on to steps four and five.  AR 15.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the

record supports it as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d

374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance

but enough evidence that a reasonable mind might find it adequate to support

the conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28

L. Ed. 2d 842 (1971); Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v.

Chater, 54 F.3d 484, 486 (8th Cir. 1995).  Review by this court extends beyond

a limited search for the existence of evidence supporting the Commissioner's

decision to include giving consideration to evidence in the record which fairly

detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th

Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v.

Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

---

[4] Section 12.04, entitled "Affective Disorders," is described as
"[c]haracterized by a disturbance of mood, accompanied by full or partial manic
or depressive syndrome.  Mood refers to a prolonged emotion that colors the
whole psychic life; it generally involves either depression or elation."  20 C.F.R.
pt. 404, subpt. P, app. 1 §§ 12.04.

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); see also Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993). The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

### DISCUSSION

Rowland argues that the Commissioner erred in finding that Rowland was not disabled during the period between the alleged onset date of April 29, 2002, and February 15, 2005. Specifically, Rowland argues that, with respect

to this time period, the Commissioner erred in failing to find that his dementia

was severe at step two, the Commissioner failed to formulate an adequate RFC,

and the Commissioner's credibility assessment was not supported by

substantial evidence.

**I.      Determination that Dementia Was Not Severe at Step Two**

At step two, the Commissioner must determine whether the claimant has

a severe impairment, that is, "one that significantly limits the claimant's

physical or mental ability to perform basic work activities."  Baker v. Apfel, 159

F.3d 1140, 1143 (8th Cir. 1998).  An impairment is not severe if it is "a slight

abnormality . . . that has no more than a minimal effect on the ability to do

basic work activities."  Social Security Ruling (SSR) 96-3p.

The determination of severity requires careful evaluation of the medical

evidence.  Social Security Ruling 96-3p provides,

> [s]ymptoms, such as pain, fatigue, shortness of breath, weakness,
> or nervousness, will not be found to affect an individual's ability to
> do basic work activities unless the individual first establishes by
> objective medical evidence (i.e., signs and laboratory findings) that
> he or she has a medically determinable physical or mental
> impairment[] and that the impairment[] could reasonably be
> expected to produce the alleged symptoms.

Id.  Further, "[a] determination that an individual's impairment[] is not severe

requires a careful evaluation of the medical findings that describe the

impairment[] (i.e., the objective medical evidence and any impairment-related

symptoms), and an informed judgment about the limitations and restrictions

the impairment[] and related symptoms impose on the individual's physical and mental ability to do basic work activities." Id. At this step, "medical evidence alone is evaluated in order to assess the effects of the impairment[] on ability to do basic work activities." SSR 85-28. If the Commissioner is unable to clearly determine the effect of an impairment on the claimant's ability to do basic work activities, the sequential evaluation should not end at step two. Id.

Rowland does not dispute that the Commissioner's determination of whether an impairment is severe must be based on medical evidence. Rather, Rowland argues that the Commissioner erred in determining the onset date for Rowland's mental impairments, specifically dementia, by failing to consider lay evidence suggesting that Rowland suffered from dementia prior to February 15, 2005. Rowland points to the Eighth Circuit case of Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997), which explains that "[i]n a case involving a degenerative disease such as multiple sclerosis, where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of [his] doctor." While none of the medical sources in this case have defined dementia as a degenerative disease, the court finds that it is an unstable condition that may progress over time, so the Grebencik rule applies. Cf. Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995) ("Although PTSD may not be degenerative in the

same classic sense as a condition like diabetes, PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation."). Notwithstanding the requirement that the severity determination at step two must be based on the medical evidence alone, the determination of when a severe condition began may require consideration of the lay evidence in the record. See Smith v. Heckler, 735 F.2d 312, 316-17 (8th Cir. 1984) (finding that the Commissioner erred in failing to consider uncontradicted lay evidence from the claimant's family and supervisors at step two of the sequential analysis); cf. SSR 83-20 (explaining that while the medical evidence serves as the primary element in the onset determination, in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity before onset can be established).

"Once [a] diagnosis is established, but the severity of the degenerative condition during the relevant period is unanswered, the claimant may fill the evidentiary gap with lay testimony." Grebenick, 121 F.3d at 1199 (citing Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984)); see also SSR 83-20 ("If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore . . . [i]nformation . . . from family members, friends, and former employers to ascertain why medical

evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition."). "The ALJ must consider this evidence, even if it is uncorroborated by objective medical evidence." Grebenick, 121 F.3d at 1199. Under this standard, "the ALJ's credibility determination of the lay witnesses becomes critical, because the ALJ is, of course, free to believe or disbelieve any or all of the lay witnesses." Id. The ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding. Basinger, 725 F.2d at 1170. In any case, "[t]he impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record." SSR 83-20. Further, where medical evidence establishing the precise onset date is not available, the Commissioner may infer the onset date. Id. When onset must be inferred, the adjudicator should call on the services of a medical advisor at the hearing. Id.

Here, the Commissioner, through the Appeals Council, determined that Rowland suffered from a number of mental impairments, including dementia, and that these impairments began and met the listing criteria of § 12.04 on February 15, 2005. Thus, a diagnosis of dementia is established and given the lack of contemporaneous objective medical evidence documenting the onset of the disease, the Appeals Council should have considered the testimony of Rowland's relatives. Grebenick, 121 F.3d at 1199. But neither the Appeals

Council nor the ALJ considered the testimony of Rowland's partner or sister that they had to help Rowland prepare his police reports and statistical reports when he was still working because he could no longer perform simple computations or remember the sequence of events.

Rather, the ALJ's and Appeals Council's decisions were based on the lack of evidence of dementia in the record prior to February 15, 2005. In considering Rowland's alleged mental impairments at step two, the ALJ assigned no weight to Dr. Fiferman's opinion that Rowland suffered from dementia, major depression, PTSD, and borderline intellectual functioning because the information about Rowland's memory difficulties came from Rowland's partner, and not Rowland himself. AR 30. The ALJ rejected Dr. Fiferman's assessment of a GAF of 44 because he found that Rowland was engaged in normal activities of daily living and social functioning. AR 30. Further, the ALJ reasoned that Rowland did not allege any mental impairment, did not allege an inability to work due to any mental impairment, did not testify that he took any psychotropic medications, and did not receive counseling or other treatment from a mental health provider. AR 31. Thus, the ALJ found that Rowland did not have a severe mental impairment at all. AR 31. The ALJ also rejected Dr. Winfrey's opinion that Rowland's mental impairments met a listed impairment on February 15, 2005, because her opinion was based on Dr. Fiferman's report. AR 31. The ALJ also found that Dr. Swenson's report

was unpersuasive because it appeared to contain inconsistencies, because Rowland's treating psychologist assessed a GAF of 65, and because Rowland received no psychotropic medication or any counseling from a mental health provider. AR 31. The ALJ discussed the credibility of Rowland's testimony at length later in his opinion, but he did not determine the credibility of his family members' testimony. See AR 32-35. Indeed, the ALJ only acknowledged Elizabeth's testimony at the 2003 hearing; he did not mention the testimony of Elizabeth or Patricia at the 2006 remand hearing.

The Appeals Council adopted the ALJ's findings with respect to the period before February 15, 2005. AR 14. The Appeals Council reasoned that there was no mention of any medically determinable mental impairment in the medical reports before Baumiller's February 15, 2005, report. AR 14. The Appeals Council agreed with Dr. Winfrey that Rowland's affective disorder met the criteria required by § 12.04 beginning February 15, 2005, the date Rowland was diagnosed with dysthymia by the VA. AR 14. The Appeals Council did not discuss the testimony of Rowland, Elizabeth, or Patricia, and did not make any new credibility findings.

The ALJ and Appeals Council made clear that there were no medical records documenting the onset of dementia, but the Appeals Council agreed that Rowland began to suffer from this disorder at some point. Thus, the ALJ and the Appeals Council should have considered the testimony of Rowland's

partner and sister regarding the deterioration of his mental faculties before he sought treatment for depression on February 15, 2005. <u>See</u> <u>Grebenick</u>, 121 F.3d at 1199 (stating that the ALJ must consider lay testimony even if it is uncorroborated by objective medical evidence). Similar to <u>Smith v. Heckler</u>, 735 F.2d at 316-17, where the ALJ made only passing reference to the testimony of relatives, made no findings concerning their testimony, and was completely silent about the affidavits of witnesses who observed the claimant at work, here, the ALJ made only passing reference to Elizabeth's testimony in the 2003 hearing, made no findings concerning her testimony, and was completely silent about Elizabeth's and Patricia's testimony at the 2006 remand hearing as well as Sharon's 2004 affidavit. Thus, as in <u>Smith v. Heckler</u>, it is reasonable to assume that the ALJ may have overlooked this evidence. <u>Id.</u> Under these circumstances, the ALJ's failure to make credibility determinations concerning the subjective testimony of Rowland's family members requires reversal and remand. <u>See</u> <u>id.</u> at 317.

In the absence of the ALJ's consideration of the testimony of Rowland's relatives, the court cannot determine if the Appeals Council's decision to adopt the opinion of Dr. Winfrey as to the date of onset is supported by substantial evidence in the record. Of course, the ALJ is free to disbelieve the testimony of Rowland's relatives. But the ALJ must make explicit credibility determinations concerning their testimony. Indeed, "[i]nitial determinations of fact and

credibility are for the ALJ, and must be set out in the decision; [the court] cannot speculate whether or why an ALJ rejected certain evidence." Jones, 65 F.3d at 104. "Accordingly, remand is necessary to fill this void in the record." Id.

On remand, the ALJ should consider all of the relevant objective and subjective evidence presented by Rowland, and if any of the evidence is to be discredited, a specific finding to that effect should be made. See Basinger, 725 F.2d at 1170. Additionally, it is "the duty of the ALJ to develop the record in such a way as to fairly evaluate the claim." Jones, 65 F.3d at 104. This duty may require additional record-building to establish with certainty the onset date of the impairment, such as asking Rowland's treating or examining providers to determine whether a retrospective diagnosis of dementia or other mental impairments is appropriate in Rowland's case. Id.

## II.    Credibility Determination

Rowland also argues that the ALJ's determination of Rowland's credibility is not supported by substantial evidence in the record. In weighing a claimant's subjective complaints, the ALJ should analyze the factors set out in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Under Polaski, "[t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians

relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." Id.; see also Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006). Additional considerations include the claimant's relevant work history and the absence of objective medical evidence to support the severity of claimant's symptoms. See Choate, 457 F.3d at 871. Without more, lack of objective medical evidence does not support discounting a claimant's subjective complaints. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).

After considering the Polaski factors, the ALJ must make an "express credibility determination." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004). Inconsistencies between the claimant's subjective complaints and the evidence as a whole may warrant an adverse credibility finding. See Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006). The ALJ must, however, state why the record as a whole supports an adverse credibility determination. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). "[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson, 363 F.3d at 738-39. The court "will not disturb the decision of an ALJ who considers, but for good

cause discredits, a claimant's complaints of disabling pain." Goff, 421 F.3d at 792 (internal quotation omitted).

Here, the ALJ set out the Polaski factors, but did not consider each factor individually. AR 27. Rather, the ALJ noted several inconsistencies that led him to conclude that Rowland's "statements concerning his impairments and their impact on his ability to work are barely credible in light of the medical evidence and the discrepancies between the claimant's assertions and the information contained in the documentary reports." AR 34. First, despite Rowland's claim that he was totally disabled, the ALJ found that Rowland had not generally received the type of medical treatment one would expect for a totally disabled individual. AR 33. Rowland made relatively infrequent trips to the doctor for his allegedly disabling symptoms, and his treatment was essentially routine and/or conservative in nature. AR 33. Moreover, the ALJ found that Rowland had sought very little medical treatment since the 2003 hearing. Although the ALJ only referenced two post-hearing appointments, podiatry appointments in December of 2003 and December of 2004, the court cannot conclude that the ALJ was not aware of the other appointments Rowland attended between the two hearings.[5] Also, it was within the province

---

[5] In addition to the podiatry appointments referenced by the ALJ, Rowland had an annual podiatric examination on December 13, 2005; diabetes follow-up appointments on June 18, 2003, July 12, 2004, December 2, 2004, June 8, 2005, October 12, 2005, and November 23, 2005; ophthalmology appointments or eye exams on July 10, 2004, August 19, 2004, December 2,

of the ALJ to conclude that these appointments were essentially routine in nature. It is inconsistent with the degree of disability asserted where no evidence exists that the claimant attempted to find medical treatment for alleged pain and disability. See Murphy, 953 F.2d at 386-87. Thus, the ALJ properly considered Rowland's relatively infrequent medical appointmentsfor his impairments between 2003 and 2006.

The ALJ also found that Rowland's testimony that he could sit for only ten minutes and lift only one pound was inconsistent with his testimony and statements to treatment providers that he was raising three grandchildren, went on a trip, played volleyball and horseshoes, worked in the garden, went on a family vacation in Nevada, and worked on his car. AR 33-34. The ALJ also found Rowland's testimony inconsistent with his testimony that he spent a typical day watching television. AR 34. The ALJ found Rowland's testimony at the remand hearing that he could only stand for ten minutes inconsistent with his testimony at the 2003 hearing that he could stand for an hour and a half. AR 34. And, the ALJ found Rowland's testimony that he could only walk for ten minutes inconsistent with the fact that he participated in a one-half mile memorial run for his daughter. AR 34. While the court may have interpreted

---

2004, January 20, 2005, and October 12, 2005; laser treatments on July 10, 2003 and October 21, 2004, a psychiatric consultation on February 15, 2005, and supportive therapy and medication management appointments on March 15, 2005, April 20, 2005, June 7, 2005, July 19, 2005, October 18, 2005, December 20, 2005, and January 17, 2006.

Rowland's testimony differently, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts," and the ALJ properly relied on these facts to determine Rowland's credibility.  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

The ALJ also found that Rowland's allegations of totally disabling symptoms were inconsistent with the fact that none of his treating or examining physicians indicated that he was disabled or had limitations greater than those found by the ALJ.  AR 34.  The ALJ cited the medical source statement from May of 2003,[6] Dr. Beasley's examination on August 27, 2003, and Dr. Hata's assessment in October of 2005.  Rowland correctly points out that the Appeals Council found that Rowland was not properly afforded his right to due process with respect to Dr. Beasley's consultative examination. Rowland argues that the ALJ should be estopped from relying on the opinion of Dr. Hata because the ALJ did not submit Rowland's proposed interrogatories to Dr. Hata.  But a claimant does not have an absolute right to submit questions to physicians who submit a report.  Passmore v. Astrue, 533 F.3d 658, 665 (8th Cir. 2008).  Rowland has not explained why submission of the interrogatories to Dr. Hata was required for full presentation of his case, so the ALJ did not abuse his discretion in relying on Dr. Hata's report.  See id.  Thus,

---

[6] Apparently, the ALJ meant to refer to the medical source statement completed by Rowland's family practice physician on May 1, 2002.  See AR 204-07.

even though the ALJ could not rely on Dr. Beasley's report, he properly relied on the opinions of Rowland's family practice physician and Dr. Hata, and the ALJ could properly consider the lack of medical evidence indicating that Rowland suffered from disabling impairments in assessing Rowland's credibility. See Curran-Kicksey v. Barnhart. 315 F.3d 964, 968 (8th Cir. 2003) ("The lack of supporting objective medical evidence may be used as one factor to be considered in evaluating the credibility of testimony and complaints.").

Finally, the ALJ found that Rowland's allegation of mental impairments was not credible because the VA found only a 20 percent disability relating to Rowland's diabetes, the VA did not find any mental impairments, and Rowland did not allege any mental impairments in his application for service-connected compensation. AR 35. Although the court may have assigned different weight to the VA's findings, the ALJ was entitled to consider the VA's findings and assign them some weight. Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998) (citing Miller v. Shalala, 8 F.3d 611, 613 (8th Cir 1993)).

Considering the ALJ's findings regarding Rowland's daily activities, the lack of evidence of disabling conditions in the medical records, and the weight to be given to the VA's determination of Rowland's service-connected disability, it is apparent that the ALJ recognized and considered the Polaski factors as well as Rowland's complaints of disabling mental and physical impairments, but discredited his complaints because they were inconsistent with the record

as a whole. The ALJ could properly discount Rowland's subjective complaints as not entirely credible, and the court cannot disturb the ALJ's decision.  See Goff, 421 F.3d at 792-93 (accepting decision of ALJ to discount claimant's complaints of disabling pain because complaints were inconsistent with medical records, claimant's admitted activity level, and claimant's work history).

## III.    Formulation of RFC

Finally, Rowland argues that the ALJ erred in formulating Rowland's RFC.  In light of the court's reversal and remand for consideration of lay testimony in the determination of the onset date of Rowland's severe impairments, the ALJ will be required to reconsider the evidence and re-formulate the RFC, if needed.  Thus, Rowland's arguments regarding the ALJ's RFC with respect to the period before February 15, 2005, are moot.

### CONCLUSION

The court finds that the Commissioner erred in determining that Rowland's dementia was not severe before February 15, 2005, because the Commissioner failed to consider evidence from lay witnesses.  Accordingly, it is hereby

ORDERED that the Commissioner's decision denying Rowland's claim for disability insurance benefits under Title II of the Social Security Act is reversed

and this matter is remanded to the Commissioner for further proceedings

consistent with this opinion.

Dated November 23, 2009.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE